## Farmers' National Bank v. Jones et al.

(Decided May 30, 1930.)

MORRIS & JONES and FRANK R. GOAD for appellant.

N. F. HARPER and W. D. GILLIAM for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming in part and reversing in part.

The Farmers' National Bank sought a judgment against H. H. Jones and thirteen others for $982.59, with interest from January 18, 1921, that being the balance then due upon a $1,300 note. It obtained a judgment, by default, against Jones, but its petition as to the other thirteen was dismissed, and it has appealed. This was a suit upon a promissory note as follows:

"Scottsville, Ky.      March 14, 1919.      $1300.00

"Six months after date we promise to pay The Allen County National Bank or order Thirteen

Hundred Dollars, value received. Negotiable and payable at the Allen County National Bank, to bear interest at the rate of six per cent per annum from date until paid. Presentation, notice and protest are hereby waived by all who may become parties to this note as makers, endorsers or otherwise.

"H. H. Jones.

"R. C. Huntsman.　　　　Ed. L. Hilburn.
"J. L. Henninger.　　　　W. D. House.
"W. D. Gilliam.　　　　　N. F. Harper.
"J. H. Gilliam.　　　　　Chas. Troutt.
"E. F. Welch.　　　　　　G. H. Newman.
"A. F. Crowe.　　　　　　Thos. W. Crowe.

"H. P. Gardner, Surety."

While this appears to have been the joint obligation, of H. H. Jones and all the other defendants, with H. P. Gardner, only, as surety, yet in fact Jones alone was the principal debtor and all the other were sureties, though, as to the twelve other than H. P. Gardner, theirs was a concealed suretyship (32 Cyc. 31), as there was nothing in the note to indicate that was their relation to it.

All the proceeds of this note were placed to the credit of H. H. Jones and checked out by him, and none of the other signers received any benefit from it.

When the note matured in September 1919, there is no evidence Jones had one cent on deposit there, but he paid $339 thereon, which discharged the interest due and reduced the principal to $1,000. Thereafter he paid $58.50 on June 14, 1920, and $39 on January 18, 1921, leaving a balance due on this note at the latter date of $982.59. Some time in March, 1921, this note was transferred by the Allen County National Bank to the First National Bank of Scottsville, Ky., and on the 13th day of November, 1923, it was transferred to the Farmers' National Bank of Scottsville, and the latter bank sued thereon September 3, 1924. H. P. Gardner was never brought before the court. H. H. Jones did not answer, and a judgment was taken against him by default.

On January 22, 1925, all the other defendants except H. P. Gardner and H. H. Jones filed an answer making various defenses which we will notice later, and by agreement this cause was transferred to equity.

The issues were made, and on final hearing resulted in a judgment as stated, and the Farmers' National Bank now insists the court erred in refusing to give it a judgment against the defendants other than Jones. The court properly refused the judgment against H. P. Gardner because he was not before the court, and to that extent the judgment is affirmed. The real controversy here concerns the right of the bank to a judgment against the twelve defendants other than Jones and H. P. Gardner, whom we shall refer to as Huntsman et al., and the determination of that controversy depends upon the sufficiency of the defenses made by them.

For their first defense they plead a novation, and allege that, when the $339 payment was made in September 1919, the Allen County National Bank, which then held the paper, accepted the individual note of H. H. Jones for $1,000 in full payment and satisfaction of the balance due on this $1,300 note. Huntsman et al. are supported in this contention by the evidence of Jones, who testifies that the bank did do this. His testimony that the bank accepted his individual note in payment of the balance due on the original note is only his conclusion from what was said and done, but he testifies what was said and done, and we will look to that to see whether or not it supports that conclusion.

Jones testified that the cashier then said to him: "I am having trouble with this note because it is past due and I will have to ask you to go and ask them to sign again." Jones did not want to ask these men to again sign his paper, and said, "I never hated to do anything as bad in my life." Thereupon the cashier said to him, "You sign this note and we will take care of it."

The cashier to whom he was talking was H. P. Gardner, one of the sureties on his paper. When he said, "We will take care of it," he may have been speaking as cashier of the bank, and may have had reference as to what the bank would do, or he may have been speaking as one of these sureties and have had reference to what he and his fellow sureties would do. So far we are left in doubt as to what he meant, and we must determine that by what was done. He did not surrender the original note, and, when Jones made subsequent payments, Gardner, the cashier, and also a surety gave credit for these payments, not upon the $1,000 note tendered by Jones, but upon the original note that had been executed by Jones and these sureties. Thus it is clearly indicated that the

bank did not accept Jones' individual note in payment of the original note, and we therefore hold there was not a novation of the contract.

These are some of the things that have led us to this conclusion. It would have been a dishonest act on the part of Gardner for him to have surrendered the note upon which he and others were surety and to have accepted in lieu thereof a note without surety, and the legal presumption is that men act honestly.

Another reason we have so concluded is the books of this bank had to be kept in balance, the bank was subject to frequent examinations, and, if these books had not been so kept, that would certainly have been discovered.

Then, too, when Jones made the payments of $58.50 on June 14, 1920, and $39 on January 18, 1921, credit had to be given for these payments somewhere, or the books would not balance, and the credit had to be made on the note the bank was carrying in its bills receivable, or the books would go out of balance, and these credits, as we have said, were placed on the original note.

If necessary, we might find other reasons to support our conclusion.

Where the new note is not the obligation of all the parties liable upon the old one, there is no presumption that it was given and accepted in payment of the old one. Baldwin v. Porter, 217 Mass. 15, 104 N. E. 492; Melledge v. Boston Iron Co., 5 Cush. (Mass.) 158, 51 Am. Dec. 59; Hoeflinger v. Wells, 47 Wis. 628, 3 N. W. 589.

What we have just said derives added force from the fact that the old note was not surrendered.

The other defense made by Huntsman et al. is that, after this note had passed from the hands of the Allen County Bank into the hands of the First National Bank, and while the latter held it, and while it was past due, Jones deposited money in the First National Bank in sums and amounts sufficient to have paid this note, and they show that on May 14, 1921, Jones had a balance in the First National Bank of $5,770.26.

Huntsman et al. also showed that Jones deposited $2,200 on August 7, 1920, and $700 on August 5, 1920, and other deposits about that time, but we have not taken those into consideration at all, for the reason that the First National Bank did not become the owner of this note until March, 1921, and the only general deposit clearly shown to have been made by Jones after the First

National Bank became the owner of this note is a deposit of $6,000, which, after discharging an overdraft of $229.74, left the above-named balance of $5,770.26.

At that time the First National Bank had the right to set off what Jones owed it on this note against what it owed Jones by reason of this deposit, and the question is, conceding that it had this right of set-off, which it could have exercised, was it under an obligation to exercise that right, and, if it failed to exercise it, were Huntsman et al., the sureties on this note, released?

The general rule regarding the right of a bank to apply deposits to payment of indebtedness to it is thus stated in 3 R. C. L. p. 588, sec. 217:

> "It may be stated as a general rule that when a depositor is indebted to a bank, and the debts are mutual—that is, between the same parties, and in the same right—the bank may apply the deposit, or such portion thereof as may be necessary, to the payment of the debt due it by the depositor, provided there is no express agreement to the contrary, and the deposit is not specifically applicable to some other particular purpose. While this right is frequently called a lien, strictly speaking it is not such, when applied to a general deposit; for a person cannot have a lien on his own property, but only on that of another; and, as is well understood, funds on general deposit in a bank are the property of the bank. This right of a bank with respect to general deposits is more accurately a right of set-off, for it rests upon and is coextensive with, the right to set off as to mutual demands."

In 7 C. J. p. 653, sec. 351, practically the same is said, and it is there stated this right of set-off is optional with the bank. This seems to be the majority rule, but there is a minority rule to this effect:

> "When the debt is in the shape of a note or other obligation owned by the bank, on which there are indorsers, sureties, or other parties not primarily liable, the bank is bound to apply the deposit for the protection of such parties. This duty, however, exists only where the depositor is primarily liable; where his deposit is sufficient to pay the debt at the time when it matures, the bank being under no obligation to apply subsequent deposits; and where

the deposit has not been previously appropriated by the depositor to any other use.''

For discussion of this rule see 7 C. J. p. 657, sec. 356, and 3 R. C. L. p. 598, sec. 226. Leading cases are, for the majority rule: Davenport v. State Banking Co., 126 Ga. 136, 54 S. E. 977, 8 L. R. A. (N. S.) 944, 115 Am. St. Rep. 68, 7 Ann. Cas. 1000. For the minority rule see: First National Bank of Lock Haven v. Peltz, 176 Pa. 513, 35 A. 218, 36 L. R. A. 832, 53 Am. St. Rep. 686; Southern Nat. Life R. C. v. People's Bank, 178 Ky. 80, 198 S. W. 543; Pursifull v. Pineville Banking Co., 97 Ky. 154, 30 S. W. 203, 17 Ky. Law Rep. 38, 53 Am. St. Rep. 409.

There are cases going even beyond the minority rule and holding that not only must a bank exercise its right of set-off when the paper matures, but which go further and hold that sureties are released if it fails to exercise this right if the principal debtor makes deposits subsequent to the maturity of the paper.

The states taking this extreme position are Delaware and Kentucky. See McDowell v. President, etc., of Bank of Wilmington, 1 Harr. 369; Bank of Taylorsville v. Hardesty, 91 S. W. 729, 28 Ky. Law Rep. 1285; Burgess v. Deposit Bank, 97 S. W. 761, 30 Ky. Law Rep. 177.

This is a rather extreme position and this court so recognized it, in the case of Eades v. Muhlenberg Savings Bank, 157 Ky. 416, 163 S. W. 494, 496, where we said:

''While it is true that where a bank is the holder of a note payable at the bank, and upon its maturity the maker has a cash deposit in the bank sufficient to pay it, not specially applicable to a particular purpose, the bank is bound to charge the amount of the note against the deposit, and its failure to do so will discharge an indorser or surety (German Nat. Bank v. Foreman, 138 Pa. 474, 21 A. 20, 21 Am. St. Rep. 908), it is also well settled that the deposit must be sufficient at the time of the maturity of the note, and must not have been previously appropriated to any other purpose. Subsequent deposits will not raise the duty. People's Bank v. Legrand, 103 Pa. 309, 49 Am. Rep. 126; First Nat. Bank of Lock Haven v. Emil Peltz, 176 Pa. 513, 35 A. 218, 36 L. R. A. 832, 53 Am. St. Rep. 686.''

This question is squarely before us now, and, if these two opinions are sound, they are determinative of this case, but, after full consideration, we have reached the conclusion this position is too extreme—that these two opinions, Bank of Taylorsville v. Hardesty, 91 S. W. 729, 28 Ky. Law Rep. 1285, and Burgess v. Deposit Bank, 97 S. W. 761, 30 Ky. Law Rep. 177, in so far as they hold a bank must exercise its right of set-off as to deposits made by a principal debtor subsequent to the maturity of his note, and while it is in the hands of the bank and past due, under pain of releasing the sureties on the note, are unsound and they are expressly overruled.

It is usually the desire of the surety to help, and not to cripple, his principal; usually it is some tie of kindred, friendship, or business relation that induces the surety to become such. The signature of the surety is a most solemn declaration of his desire to aid the principal debtor. It frequently happens that considerable time is consumed in renewing notes, and nothing could be more embarrassing to a struggling debtor than to have the bank compelled to grab every deposit he makes while his paper is past due. If a surety tires of that relation, section 4668, Ky. Stats., provides an ample remedy for his use.

These sureties contend they had no notice that this paper was not paid at maturity, but the answer to that is contained in the note itself. They waived notice.

The judgment is affirmed as to H. P. Gardner, and the bank will pay the cost as to the appeal against him, but as to Huntsman et al. the judgment is reversed, with directions to enter judgment against them for $982.59, with interest from January 18, 1921, and for costs both in the trial court and this one.

The whole court sitting.