### MEREDITH

v.

### FIRST NAT. BANK OF CENTRAL CITY.

Court of Appeals of Kentucky.

May 7, 1954.

Rehearing Denied Oct. 15, 1954.

David C. Brodie, Anderson & Anderson, Carroll E. Byron, John F. Wood, B. C. Green, Wilson & Wilson, Owensboro, for appellant.

Woodward, Bartlett & McCarroll, Owensboro, for appellee.

MILLIKEN, Judge.

Approximately twenty years ago Hubert T. Meredith, former Attorney General of Kentucky, signed a promissory note for Mr. J. D. Eades, payable to the First National Bank of Central City in the amount of $2,000, and renewed it every four months until April, 1945. Mr. Eades died in 1946, a year after his committal to the Western Kentucky Hospital for the Insane. By the form of notes General Meredith was a co-maker, but the evidence is rather clear that the bank knew that the General received none of the proceeds. After the death of Mr. Eades, the bank sued the General for the balance of $1,375 due on the last renewal note which was dated April 13, 1945, and the trial court peremptorily instructed the jury to find for the bank. The propriety of this instruction is the controlling issue on this appeal.

The General pleaded that he would not have renewed the note in April, 1945, had he known at that time of a 1943 transaction between the bank and J. D. Eades, which he asserts had the legal effect of releasing him as surety on the Eades note. In 1943 the bank bought $2,778.61 of real estate lien notes from J. D. Eades, and no fault is found with the purchase in itself, but the disposition of the proceeds is the subject of General Meredith's complaint. The bank applied the $2,778.61 given for the notes in

the following way: (1) $1,500 to the payment of a note due it from Mrs. Sam Henry, a sister of J. D. Eades, her husband, Sam Henry, and Will Eades, a brother of J. D. Eades; (2) $500 on a note due it from Arvall Eades, on which J. D. Eades was a co-maker; and (3) the balance it applied to the J. D. Eades-General Meredith note, thus reducing it to the $1,375 sued for in this action. General Meredith contends that this transaction amounted to a gift of $2,000 to the relatives of J. D. Eades on the one hand, and on the other hand enabled the bank to collect the dubious and uncollectible notes of the Henrys and Arvall Eades, notes which had been charged off by the bank for several years. General Meredith also contends that this disposition of the assets of J. D. Eades had the badges of fraud in that it benefited his near relatives, was done in secrecy, resulted in the insolvency of J. D. Eades by applying most of his assets to a debt which was not his own, all of which was done to the great benefit of the bank and the relatives of J. D. Eades and all of which resulted in General Meredith holding the bag on the present note. It is contended that this conduct on the part of the bank and J. D. Eades discharged General Meredith of all liability as factual surety on the note in suit.

The bank's view of the transaction is quite different. According to the bank, during the period it held the Meredith note Arvall Eades borrowed $500 from the bank with his father, J. D. Eades, as surety, and that that note really was for the benefit of J. D. Eades. Furthermore, prior to December, 1934, J. D. Eades borrowed $1,500 and executed his note to the bank for that sum, with Sam Henry and Will Eades as surety. The note was renewed from time to time, until bank examiners criticized it and required the bank to make some disposition of it. Thereupon, Mrs. Sam Henry executed her note to the bank, with her husband and Will Eades as surety, and took up the J. D. Eades note for $1,500. She did not receive one cent from the transaction. When the Henry note was exchanged for the $1,500 Eades note, Eades allegedly executed to Sam Henry a note for $750 and one

to Will Eades in like amount, which together covered the amount of the so-called Henry $1,500 note. The bank contends the record shows, therefore, without contradiction, that Eades was morally and legally obligated on the $500 Eades note and the $1,500 note executed by Mrs. Henry. The alleged $750 notes to the Henrys and Will Eades were not produced in evidence, but Sam Henry orally confirmed their execution and delivery from the witness stand. The bank also declared that J. D. Eades sold his $2,788.61 of real estate notes to the bank with the understanding that the proceeds be applied as they were. In fact, the bank contends that the proceeds were placed in J. D. Eades Special Account and J. D. Eades drew checks upon it so distributing the fund, but no written confirmation of this was produced from the bank records nor were the canceled checks produced.

The question as to whether the bank's distribution of the $2,788.61 gleaned from the Eades real estate notes was an illegal diversion of the Eades assets to the General's detriment depends on the scope of the duty, if any, that the bank owed the General. There is no proof in the record that the Eades-Meredith note was either due or matured at the time of the 1943 distribution of the proceeds from the discount of the $2,778.61 Eades real estate notes. Even had the $2,788.61 been deposited in Mr. Eades' general account, there would have been no duty on the part of the bank in the circumstances to exercise its right of set-off under pain of releasing the surety on the note. Farmers' National Bank v. Jones, 234 Ky. 591, 28 S.W.2d 787, 789, 70 A.L.R. 335. In the opinion in that case, this court reasoned:

"It is usually the desire of the surety to help, and not to cripple, his principal; usually it is some tie of kindred, friendship, or business relation that induces the surety to become such. The signature of the surety is a most solemn declaration of his desire to aid the principal debtor. It frequently happens that considerable time is consumed in renewing notes, and nothing could be more embarrassing to a struggling

debtor than to have the bank compelled to grab every deposit he makes while his paper is past due. If a surety tires of that relation, section 4668, Ky.Stats. [now KRS 412.110], provides an ample remedy for his use."

See, also, 7 Am.Jur., Banks, Sections 642, 643, at pages 466, 467.

If there were no duty to exercise its power of set-off in such circumstances, certainly there was no duty on the part of the bank to inform the surety of the disposition the principal was making of his assets. The surety here was not misled; he automatically renewed the note after the 1943 transactions as he had done many years before. In fact, the many years during which the note was renewed before the substantial payment made upon it in 1943 indicates that the General was rather resigned to his fate, yet was generously trying to help his friend, Mr. Eades.

The judgment is affirmed.

CAMMACK, J., not sitting.